UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Case # 20-CR-6113-FPG-MJP

v.

DECISION AND ORDER

JOSEPH McGRAIN,

                            Defendant.

## INTRODUCTION

Defendant Joseph McGrain is charged in a three-count Indictment with (1) enticement of a minor in violation of 18 U.S.C. § 2422(b); (2) attempted obstruction of justice in violation of 18 U.S.C. § 1512(b)(1); and (3) obstruction of justice in violation of 18 U.S.C. § 1519. ECF No. 17 at 1-2.[1] By Order dated August 21, 2020, this case was referred to United States Magistrate Judge Mark W. Pedersen pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (b)(1)(B).

On October 29, 2020, Defendant filed an omnibus motion requesting, *inter alia*, suppression of tangible evidence and suppression of certain statements. ECF No. 30 at 5-6. On January 25, 2021, Judge Pedersen held oral argument, ECF No. 46, and subsequently issued an order memorializing his rulings, ECF No. 47.[2] In that order, Judge Pedersen reserved on whether to hold a suppression hearing on the suppression of tangible evidence and the suppression of statements. *Id.*

---

[1] The Indictment also includes a forfeiture allegation pursuant to 18 U.S.C. §§ 2428(a)(1) and 2428(b)(1)(A).

[2] Judge Pedersen denied the following motions: (1) Motion for Discovery; (2) Motion for Disclosure of Jenks Material; (3) Motion for Bill of Particulars; (4) Motion for Release of Brady Materials; and (5) Motion for Preservation of Rough Notes. ECF No. 47. Judge Pedersen granted Defendant's Motion for Leave to File Additional Motions. *Id.*

On February 4, 2021, Judge Pedersen issued a report and recommendation ("R&R"), ECF No. 52, recommending that (1) Defendant's motion to suppress tangible evidence be denied; and (2) Defendant's motion to suppress certain statements be denied. Defendant filed objections to the R&R on February 16, 2021, ECF No. 53. The Government responded in opposition to Defendant's objections, ECF No. 55. For the reasons that follow, the Court ADOPTS IN PART and REJECTS IN PART Judge Pedersen's R&R and Defendant's motion to suppress is GRANTED IN PART and DENIED IN PART.

## LEGAL STANDARD

On a dispositive matter—*e.g.*, motions to suppress and to dismiss the indictment—the magistrate judge may only issue an R&R. 28 U.S.C. § 636(b)(1)(B). A district court reviews those portions of an R&R to which a party has timely objected *de novo*. Fed. R. Crim. P. 59(b)(3). When a party does not object to a portion of an R&R, or when the objections are conclusory, general, or without legal support, a district court reviews those portions for clear error. *See United States v. Preston*, 635 F. Supp. 2d 267, 269 (W.D.N.Y. 2009). After reviewing the R&R and the objections thereto, a district court "may accept, reject, or modify the recommendation." Fed. R. Crim. P. 59(b)(3).

## DISCUSSION

Defendant timely objected to Judge Pedersen's R&R. ECF No. 53. Specifically, Defendant argues that Judge Pedersen erred when he (1) denied the suppression of all tangible evidence seized pursuant to the search of Defendant's van and cellular telephone; and (2) denied suppression of Defendant's statements to law enforcement on March 27, 2020 and April 6, 2020. ECF No. 53 at 3, 10.

## I.      Tangible Evidence

The Fourth Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The probable cause requirement is "not a high bar" and is met where "the totality of the circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Pinto-Thomaz*, 352 F. Supp. 287, 304 (S.D.N.Y. 2018) (citations omitted). "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.*

"The particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (citations, footnotes & internal quotation marks omitted). In the context of digital searches, courts have recognized a "heightened sensitivity to the particularity requirement" to combat the risk that unfettered searches of digital devices could render the Fourth Amendment's protections irrelevant. *Id.* at 447.

A.      **Search of Van and Cellular Phone**[3]

Defendant argues that the warrant affidavit for the search of the Dodge Caravan lacked probable cause under the Fourth Amendment. ECF No. 53 at 6. The Government argues that, in light of the substantial deference owed to Greece Town Court Judge Brett C. Granville's probable cause determination, the Court should deny Defendant's request to suppress this evidence. ECF No. 55 at 3.

"[T]he duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Thompson*, 1:18-CR-00126 EAW, 2020 WL 408354, at *6 (W.D.N.Y. Jan. 24, 2020) (citation & internal quotation marks omitted). Accordingly, "substantial deference" is accorded to an issuing judicial officer's finding that probable cause exists, and a reviewing court's inquiry is limited "to whether the officer 'had a substantial basis' for his or her determination that, given the totality of the circumstances, there was 'a fair probability that contraband or evidence of a crime w[ould] be found in a particular place.'" *United States v. Reyes*, 2017 WL 2633388, at *3 (D. Conn. June 19, 2017) (citing *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015)) (alterations in original).

To justify a search of Defendant's Dodge Caravan to seize his cell phone, "police needed reason to think not only that he possessed a phone, but also that the device would be located in the [vehicle] and would contain incriminating evidence of the suspected offense." *See United States v. Griffith*, 867 F.3d 1265, 1273 (D.C. Cir. 2017). With respect to the first consideration—Defendant's ownership of a cell phone—the affidavit provides specific reasons why police

---

[3] Defendant does not separately challenge the search of the cellular telephone itself but, rather, "moves to suppress the contents of the cellular telephone on the grounds that the search warrant for the Dodge Caravan lacked sufficient probable cause." ECF No. 30 at 6.

believed that Defendant owned a phone. The Minor Victim, who lived with Defendant, described Defendant's cell phone to police during a forensic interview. ECF No. 30-1 at 7. More specifically, the Minor Victim stated that Defendant owned "a Samsung Smartphone with what appears to be a gray case with a skull" *Id.* The affidavit also states that the Minor Victim provided police with Defendant's cell phone number during the interview and police later received a call from Defendant at that number. *Id.* Thus, the affidavit sufficiently evidences why police believed Defendant owned a cell phone. *Compare United States v. Carton*, No. 17 CR 680 (CM), 2018 WL 3559172, at *6 (S.D.N.Y. July 10, 2018) ("[T]he affidavit set forth comprehensive evidence . . . that [Defendant] owned a cell phone.") *with Griffith*, 867 F.3d at 1272 ("[T]he affidavit in this case conveyed no reason to think that [Defendant], in particular, owned a cell phone.")

Turning to the second consideration, the affidavit also supports the conclusion that police had reason to think that the cell phone would be located in the vehicle. The affidavit states that Greece Police Detective Reeder received a call from Defendant's cell phone number at 2:52 p.m. on April 6, 2020. ECF No. 30-1 at 7. As stated above, officers knew it was Defendant's cell phone number because the Minor Victim had provided the number to them during a forensic interview. *Id.* During the phone call, Defendant told police that he "was leaving work to come straight to the Greece Police HQ . . . and would be there in 15 minutes." *Id.* Defendant arrived at Greece Police Headquarters in his Dodge Caravan at around 3:30 p.m. *Id.* Upon arriving and being taken to an interview room, Defendant "state[d] he only had keys to his van and a wallet on his person and did not have a phone." *Id.* At some point after Defendant arrived at the Police Headquarters, Detective Reeder spoke with Defendant's girlfriend who stated he did not stop home between work and arriving at Police Headquarters. ECF No. 30-1 at 7.

Based on the evidence in the affidavit described above, officers knew that (1) Defendant had his cell phone with him at work when he spoke with them on it at 2:52 p.m.; (2) Defendant had arrived at Headquarters in his Dodge Caravan; (3) Defendant did not have the cell phone on his person upon his arrival (less than 40 minutes after the phone call); and (4) Defendant had not stopped home between leaving work and arriving at Headquarters. While it was possible that Defendant had either left his cell phone at work or discarded it enroute to Headquarters, the evidence in the affidavit is more than sufficient to provide officers with reason to think that Defendant's cell phone would be found in his Dodge Caravan. *Compare United States v. Manafort*, 314 F. Supp. 3d 258, 267 (D.D.C. 2018) ("Moreover, the agent specifically averred, based on information provided by a person with knowledge, that [Defendant] maintained business records in his home and conducted business with his computer.") *and Reyes*, 2017 WL 2633388, at *3 ("I cannot say in light of the deferential standard of review that the state court judge altogether lacked a substantial basis to conclude that there was probable cause. Common sense and experience suggest that it was reasonable and plausible for the state court judge to conclude that defendant would keep one or more cell phones and related records at his home.") *with Griffith*, 867 F.3d at 1273 ("[T]he affidavit set out no reason to believe the phone was likely to be found at the place to be searched."). This is especially true in light of the Supreme Court's recognition that "nearly three-quarters of smart phone users report being within five feet of their phones most of the time" and that cell phones are a "pervasive and insistent part of daily life." *Riley v. California*, 573 U.S. 373, 385, 395 (2014).

Finally, police had sufficient reason to think that the cell phone would contain incriminating evidence of the suspected offense. As set out in the warrant affidavit, the Minor Victim's mother (Defendant's girlfriend) voluntarily consented to a search of the Minor Victim's

phone on April 1, 2020. ECF No. 30-1 at 6. Officers searched the Minor Victim's phone and attempted to download deleted items. The affidavit further states that Defendant sent the Minor Victim a sexually explicit message on February 23, 2020 and described sexual conduct he wished to engage in with the Minor Victim. *Id.* at 7. In addition, the affidavit states that a forensic interview with the Minor Victim conducted on April 6, 2020 revealed that "she had sent [Defendant] numerous naked photographs of herself to his phone via text message and snapchat." *Id.* Based on these facts, the affidavit shows that officers had reason to think that the cell phone would contain incriminating evidence of Defendant's suspected offense (enticement of a minor). *See United States v. Grinder*, 808 F. App'x 145, 147 (4th Cir. 2020) ("[T]he officers knew that Grinder had a cell phone and that he had used it to send incriminating text messages."); *United States v. Carton*, No. 17 CR 680 (CM), 2018 WL 3559172, at *6 (S.D.N.Y. July 10, 2018) ("[T]he affidavit set forth comprehensive evidence both that [Defendant] owned a cell phone *and used it extensively in furtherance of his crimes*. Magistrate Judge Parker thus correctly found probable cause and issued the Warrant.") (emphasis added).

Based on the foregoing, the Court finds that Judge Granville had a substantial basis to conclude, based on the totality of the circumstances presented in the warrant affidavit, that there was a fair probability that evidence of a crime would be found in the Dodge Caravan. *See Reyes*, 2017 WL 2633388, at *3.

### B.   Search of Defendant's Social Media Accounts

Defendant also moves to suppress evidence obtained pursuant to searches of his Facebook and Google Accounts (the "Accounts"). Defendant argues that that the search warrant applications regarding these Accounts failed to establish probable cause to believe that evidence of the alleged crime would be found within these Accounts "for the same reasons" the warrant affidavit to search

the Dodge Caravan. ECF No. 53 at 6. The Accounts were searched pursuant to search warrants issued by Judge Granville based upon warrant affidavits submitted by Greece Police Detective Justin Reeder. ECF Nos. 30-2; 30-3. The Court turns first to the warrant application for Defendant's Facebook account before turning to the one for his Google account.

"Courts have recognized a Fourth Amendment interest in the data contained in an individual's [social media] account." *United States v. Shipp*, 392 F. Supp. 3d 300, n.4 (E.D.N.Y. 2019). "When a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment." *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y. 2012). "However, postings using more secure privacy settings reflect the users' intent to preserve information as private and may be constitutionally protected." *Id.* As explained above, "the duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Thompson*, 1:18-CR-00126 EAW, 2020 WL 408354, at *6 (W.D.N.Y. Jan 24, 2020) (citation & internal quotation marks omitted).

### i.      Facebook Warrant Affidavit

Here, the warrant affidavit regarding Defendant's Facebook included, *inter alia*, the following allegations related to Defendant and his Facebook account:

- The Minor Victim's stepsisters discovered messages on the Minor Victim's phone when one of the stepsisters borrowed it to make a call. The messages were of such a nature that another family member alerted the authorities after becoming aware of them. ECF No. 30-2 at 10.

- On April 1, 2020, the Minor Victim and her mother (the owner of the Minor Victim's cellular telephone) voluntarily signed a consent to the search of the Minor Victim's cellular telephone. *Id.*

- During a search of the Minor Victim's cellular telephone, investigators discovered "[a]n extensive Facebook conversation between [Defendant] and the [Minor Victim] .

. . back to October 8th of 2018 in which they express their love and feelings for each other and play 'Thuglife' game together." *Id.*

- The warrant affidavit includes specific Facebook messages, with date and timestamps, illicit messages between Defendant and the Minor Victim in which Defendant referenced a history of sexual encounters with the Minor Victim and detailed sexual acts he would like to engage in with the Minor Victim. *Id.* at 11.

- Investigators determined Defendant's Facebook ID username through a forensic investigation of Defendant's and the Minor Victim's cellular telephones. *Id.* at 13.

Based on these facts, the warrant affidavit in support of the search of Defendant's Facebook account established probable cause to believe that Defendant's Facebook account would contain evidence of his alleged enticement of the Minor Victim. Defendant used his Facebook account to communicate with the Minor Victim about sexual acts he wished to perform with her and referenced prior sexual encounters during their Facebook conversations. *See* ECF No. 30-2 at 10-11. Thus, Detective Reeder's allegations that Defendant participated with the Minor Victim in a Facebook discussion of the alleged illicit encounters established probable cause to believe that Defendant's account would contain evidence of the enticement of a minor offense. "That is enough to establish reason to believe that a search of [Defendant's] account would yield further evidence of [sexual crimes]." *See United States v. Westley*, No. 3:17-CR-171 (MPS), 2018 WL 3448161, at *8 (D. Conn. July 17, 2018).

### ii.   Google Account

The Court turns next to the warrant affidavit in support of the application to search Defendant's Google account. ECF No. 30-3. In addition to the facts discussed above, the affidavit included, *inter alia*, the following allegations specifically related to Defendant's Google account:

- The warrant detailed the relationship history between Defendant and the Minor Victim, including their history of communicating via Facebook, Snapchat, and through voicemails.

- Investigators found, upon accessing Defendant's cellular telephone, that it "appeared to be recently wiped of data, pictures, history, and text messages." ECF No. 30-3 at 10.

- Detective Reeder noted, based on his experience, that Defendant's photographs appeared to be deleted except for six photos. *Id.* He also noted that all text conversations between Defendant and the Minor Victim had been deleted. *Id.* Further, Reeder noted that there was no "Snapchat" application on the phone despite evidence from the Minor Victim's phone indicating that Defendant had sent the Minor Victim a Snapchat message. *Id.*

- Investigators determined that Defendant used Google services to back up his phone and investigators also determined Defendant's user Google account and subscriber information. ECF No. 30-3 at 11.

- Detective Reeder stated his belief, based upon his training, that "illicit photographs and text messages were sent via electronic means, such as Facebook, Snapchat and Text (SMS) messages between [Defendant] and [the Minor Victim] over their cellular or electronic devices, and were saved by [Defendant] to a cell phone or another electronic storage device(s)." *Id.*

- Reeder also stated that, "[b]ased on [his] training and experience these type of offenders often back up and save illicit pictures of their victims and messages on more than one device, electronic storage media, cloud storage services, or printed images that are hidden or stored within their home, place of business, or personal property. It is believed these messages and photographs contained on the above media are located . . . with the GMail Cloud, and Text (SMS) messages between the [Defendant and Minor Victim] on their Verizon and T-Mobile phones." *Id.* at 11-12.

These facts establish probable cause to believe that Defendant's Google account would contain evidence of his alleged enticement of the Minor Victim. Defendant used his cellular telephone to communicate with the Minor Victim about sexual acts he wished to perform with her and to reference prior sexual encounters. ECF No. 30-3 at 7-8. The affidavit establishes that Defendant's deleted messages likely contained evidence of his crimes, and that Defendant's Google account likely contained storage of those deleted messages. Accordingly, the warrant to search Defendant's Google account was supported by probable cause. *See Westley*, WL 3448161, at *8.

The Court therefore adopts Judge Pedersen's R&R with respect to the search of the Dodge Caravan and the Facebook and Google Accounts.

## II.    Statements to Law Enforcement

It is well-settled that police may not interrogate a suspect who has been taken into custody without first advising him of his *Miranda* rights. *United State v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).  However, it is only in the context of a custodial interrogation that a defendant is entitled to be informed of his *Miranda* rights. *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000); *Tankleff v. Senkowski*, 135 F.3d 235, 242-43 (2d Cir. 1998).

In determining custodial status, the test is "whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest," and whether there were any "affirmative indications that the defendant was not free to leave." *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir. 1995) (internal citation and quotations omitted). An actual arrest is not a prerequisite for an accused to be "in custody." Rather, it is sufficient "when law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." *United States v. Badmus*, 325 F.3d 133, 138 (2d Cir. 2003) (citation and quotations omitted); *see United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969) ("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so.").

"A reasonable person's expectations about how the questioning is likely to unfold are also relevant." *FNU LNU*, 653 F.3d at 153. In other words, "custody" will depend on whether a reasonable person in the suspect's position would have understood himself to be "subjected to restraints comparable to those associated with a formal arrest." *Georgison v. Donelli*, 588 F.3d

145, 155 (2d Cir. 2009). The safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

### A.    March 27, 2020 Statements

In his sworn affidavit, Defendant states the following with respect to the March 27, 2020 encounter with police: "[O]n March 27, 2020, officers from the Greece Police Department came to my home . . . in Greece, New York. I advised the officers I did not want to speak with them." ECF No. 30-4 at 1.

Defendant "concedes that [Defendant] was not in custody during the March 27, 2020 encounter," but "reserves [his] right to challenge the admissibility of such statements at trial on the grounds that the government has not demonstrated any applicable exception to the rule against hearsay." ECF No. 53 at 8. The Court therefore adopts Judge Pedersen's recommendation that this Court deny Defendant's motion to suppress statements from the March 27, 2020 interaction with police. *See* ECF No. 52 at 7.

### B.    April 6, 2020 Telephone Call Statements[4]

Defendant also objects to Judge Pedersen's findings regarding two telephone conversations with officers on April 6, 2020 and seeks suppression of those calls on the basis that "Defendant was in custody and was not accurately advised of his constitutional rights." ECF No. 53 at 8.

The Court considers first whether Defendant was in custody at the time of the calls. Defendant made two phone calls to law enforcement on April 6, 2020.[5] Defendant's affidavit states

---

[4] Defendant has reserved his right to challenge the admissibility of the telephone calls at trial. ECF No. 53 at 8.

[5] Exhibits D & E of the Government's opposition to Defendant's motion are audio recordings of the telephone calls. ECF No. 43, Exs. D& E. The Court reviewed these recordings as a part of its analysis. The recordings are on file with the Court.

that "a police officer called me and instructed me to meet him at the Greece Police Headquarters. The officer told me that I was under arrest. Based on my prior statement to the police that I did not want to speak with them, together with the officer's direction to go to the Police Headquarters, I did not believe that I was free to refuse the officer's instructions." ECF No. 30-4 at 2. Though Defendant's affidavit states that "police officers called me," the Court notes that the conversations in question were initiated by the Defendant. A Greece Police Officer called Defendant and he did not answer. *See* ECF No. 53 at 2. Defendant then returned the call, initiating the first phone conversation with police. *Id.* Indeed, Defendant's objections to the R&R state that "[i]t is understood that Defendant called the Greece Police on April 6, 2020, when he learned that the officers were looking for him." ECF No. 53 at 9. Defendant later made a follow-up call to the Officer to confirm that he was on his way to Police Headquarters and had been able to leave work earlier than expected. ECF No. 43, Ex. E.

"[N]umerous federal courts have determined that a phone call to police initiated by a suspect is not a custodial interrogation under *Miranda*." *Westbrooks v. Capozza*, CIVIL NO: 1:17-CV-01721, 2019 WL 17759059, at *7 (M.D. Pa. Oct. 8, 2019) (collecting cases). Even though Defendant's first call to officers in this case was in response to a call he missed from police, he initiated the returned call, when the parties actually spoke, and the subsequent follow-up call. Moreover, at no time during any of the calls did Defendant did have a restriction on his freedom that would render him in custody. *See United States v. Deleon*, 173 F. App'x 562, 564 (9th Cir. 2006) (summary order) ("*Miranda* warnings must be provided only where there has been such a restriction on a person's freedom as to render him 'in custody.' No restriction on [Defendant's] freedom occurred during his phone conversation with the DEA agent. Because [Defendant] was therefore not in custody, he was not entitled to *Miranda* warnings.") (internal citations omitted).

13

Accordingly, the Court denies Defendant's motion to suppress the April 6, 2020 telephone calls with law enforcement on that basis that he was "in-custody" for purposes of *Miranda*.

Even though he was not in custody at the time, Defendant also seeks suppression of the April 6, 2020 telephone calls on the basis that he "was not accurately advised of his constitutional rights." ECF No. 53 at 8. During the first telephone call, Defendant asked police officers "do I need my attorney" ECF No. 43, Ex. D at 1:12. The officer stated in response "you don't need your attorney . . . he can meet you over at arraignment but that won't be until a little bit later, I just didn't want you to have to have him on standby." *Id.* at 1:16. However, later on, near the end of the call, the officer said "meet me up [at Headquarters] at 4:30 p.m., you can have your lawyer with you that's fine and then uh we'll go from there." *Id.* at 4:29.

> For a suspect to invoke his *Miranda* right to counsel, he must at a minimum make "some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation.*" *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis in original). "If an accused makes a statement concerning the right to counsel that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her Miranda rights." *Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 2259–60, 176 L.Ed.2d 1098 (2010) (internal quotation marks and citations omitted). Statements such as: "Maybe I should talk to a lawyer," *Davis v. United States*, 512 U.S. 452, 462, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (internal quotation marks omitted); "Do you think I need a lawyer?" *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir.1996); and a suspect's statement that he "was going to get a lawyer," *United States v. Scarpa*, 897 F.2d 63, 68 (2d Cir.1990), have been found to be insufficient to constitute an unambiguous request for counsel. Similarly, the Supreme Court has held that an accused who wants to invoke his or her right to remain silent must do so unambiguously. *See Berghuis*, 130 S.Ct. at 2260.

*United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012). Here, although the officer initially indicated that Defendant did not need his attorney, he later clearly stated "you can have your lawyer with you that's fine." ECF No. 43, Ex. D at 4:29. As discussed above, Defendant was not in custody at the time of the phone call. Moreover, Defendant's question to the officer asking "do

I need my attorney" was not an unambiguous invocation of his right to counsel. Accordingly, the Court denies Defendant's motion to suppress the April 6, 2020 telephone calls on the ground that Defendant "was not accurately advised of his constitutional rights."

### C.      April 6, 2020 Police Interview at Headquarters[6]

The Court turns next to Defendant's objections to Judge Pedersen's ruling that statements made during the April 6, 2020 police interview at Greece Police Headquarters should not be suppressed. *See* ECF No. 52 at 9; ECF No. 53 at 9. Defendant seeks to suppress "all statements made by [Defendant] during the April 6, 2020 interrogation at the police station."[7] ECF No. 53 at 10. The Government concedes that this encounter "was a custodial interrogation for *Miranda* purposes." ECF No. 43 at 9; ECF No. 55 at 9.

### i.      Pre-*Miranda* Statements

Defendant's objections assert that "[o]nce Defendant was in an interrogation room, officers began questioning [him] before advising him of his constitutional rights," and that "[i]t was only after a portion of the questioning that [Defendant] was instructed to sign the waiver form." ECF No. 53 at 10. Defendant did indeed engage in a discussion with officers for approximately 16 minutes before he was verbally advised of his *Miranda* rights and officers filled out a waiver form. *See* ECF No. 43, Exs. F at 3:36:00PM-3:52:43PM & G. The Government characterizes this preliminary discussion as officers "obtaining some pedigree information." ECF No. 55 at 9. In the R&R, Judge Pedersen found that any pre-*Miranda* questioning was unrelated to officers'

---

[6] The Court has reviewed the video recording of the interview. ECF No. 43, Ex. F. The recording is on file with the Court.

[7] The Court does not read this argument as objecting to Judge Pedersen's recommendation that the statements made post-invocation of counsel be suppressed, though Defendant's brief does not acknowledge the fact that the R&R recommended suppression of such statements. *See* ECF No. 52 at 9; ECF No. 53 1, 3-10.

investigation. ECF No. 52 at 8 ("Prior to asking any [questions] pertaining to their investigation, an officer read Defendant his *Miranda* Warnings."). The Court disagrees.[8]

"A well-established exception to the *Miranda* requirement exists for questions relating to general pedigree information." *United States v. Durr*, No. 09–CR–6232L, 2010 WL319987, at *7 (W.D.N.Y. July 22, 2010). Pursuant to this exception, the "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona*, . . . whether the solicitation occurs before . . . or after . . . *Miranda* warnings are given." *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir. 1988) (citations omitted).

"The pedigree exception includes 'routine booking question[s]' designed to elicit 'biographical data necessary to complete booking or pretrial services.'" *Durr*, 2010 WL319987, at *7 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601, 110 S. Ct. 2638, 110 L.Ed.2d 528 (1990)). Routine booking questions include, for example, questions to obtain telephone numbers, the arrestee's name, date of birth and address. *Id.* Such information is "regularly collected pursuant to routine booking questions." *Id.* (collecting cases).

Questions designed to elicit incriminating admissions are not encompassed by the pedigree exception. *Muniz*, 496 U.S. at 602 n.14. "As the Second Circuit has acknowledged, '[r]outine questions about a suspect's identity . . . [are] ordinarily innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to check; they are rather the sort of questions 'normally attendant to arrest and custody.'" *Durr*, 2010 WL319987, at *7 (citing *United States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986)) (additional citations omitted). Nonetheless, where basic pedigree information is "likely to provide the primary evidence" and goes to the "heart of the crime

---

[8] The Court notes that the parties did not provide any briefing on the pedigree exception and Defendant's broad-based suppression argument did not cull out which pre-*Miranda* statements may fall within the exception, which pre-*Miranda* statements are potentially outside the exception and subject to suppression, and which, if any, pre-*Miranda* statements may have been voluntarily made by Defendant. This left the heavy lifting to this Court.

itself," courts have found *Miranda* warnings to be required. *United States v. Toribio–Toribio*, No. 09–cr–161, 2009 WL 2426015, *2 (N.D.N.Y. 2009).

Here, some of the pre-*Miranda* questioning falls within the pedigree exception and demonstrates officers obtaining biographical information. Other portions of the pre-*Miranda* questioning could be characterized as affable chit-chat that is "ordinarily innocent of any investigative purpose." *See Durr*, 2010 WL319987, at *7. For example, the officers engaged Defendant in a conversation about his job in the food-service business, the process for making horseradish, how food obtains a certification of "organic," and the effect of the COVID-19 Pandemic on Defendant's place of employment. ECF No. 43, Ex. F at 3:36:00PM-3:38:50PM. However, significant portions of the pre-*Miranda* questioning clearly went beyond pedigree information, as they were directly pertinent to the officers' investigation.

First, after officers and Defendant talked about cancelled flight and vacation plans due to COVID-19, Defendant stated "we go to Darien Lake a lot too." *Id.* at 3:39:28PM. One of the officers then said, "I saw [your] sweatshirt. What's at Darien Lake?" Defendant stated in response, "concerts, camping . . . me and my family love to camp." The officer then asked several follow-up questions which Defendant answered, including whether Defendant owned or rented a camper, which concerts Defendant attends, whether he has "lawn seats," and what type of music Defendant enjoys.

The investigation in this case uncovered Facebook messages that are allegedly between Defendant and the Minor Victim and include the following statements allegedly made by Defendant: ". . . I told you to stay there and live your life . . . I'm done with you and these games . . . fuck you and never ask me for shit . . . lose my number better yet block me. [A]nd *I'm not doing camping concerts shit with you cause I cant be near you.* [I]ts been great without you here.

. . you do nothing but play me for pot and to get your own way . . . fuck you bitch you and the sex is no worth it"; and  "I hate you you liar you had it planned[.] *I not doing any concerts or camping with you* . . . stay away." Ex. 2 to Detention Hearing, pg. 328 (emphasis added).[9] Detective Reeder, one of the interrogating officers, referenced portions of this same conversation in support of his warrant affidavits. *See, e.g.*, ECF No. 30-2 at 11. Thus, he was likely aware of the references to "concerts" and "camping" in the messages that were allegedly sent by Defendant to the Minor Victim.[10] Accordingly, officers' questions posed to Defendant about Darien Lake, concerts, and camping were "reasonably likely to elicit an incriminating response" and must be suppressed. *United States v. Carneglia*, 603 F. Supp. 2d 488, 498 (E.D.N.Y. 2009) ("If defendant's pre-*Miranda* comment about his beard had any bearing on the facts of the case, it could be assumed that these statements were the product of deliberate questioning by experienced law enforcement personnel who were aware of the mafia's rules against facial hair. The officer's questioning about the beard would then not have been characterized as affable chit-chat normally attendant on an arrest, but designed to be reasonably likely to elicit an incriminating response.") (citation and internal quotation marks omitted).

The same can be said for the portion of the pre-*Miranda* questioning beginning at 3:42:53PM where one of the officers, unprompted, transitioned the conversation from a discussion of music and concerts and asked "So how many daughters you got?" ECF No. 43, Ex. F at 3:42:53PM. This prompted a back-and-forth with officers during which Defendant discussed: how the Minor Victim came to live with Defendant and his girlfriend; Defendant's parenting style and expectations, including as to the Minor Victim; the Minor Victim's past living arrangements;

---

[9] This Exhibit is on file with the Court.

[10] Importantly, Defendant disputes during the custodial interrogation that he wrote the Facebook messages that are allegedly between him and the Minor Victim.

Defendant's understanding of the Minor Victim's allegations; and that Defendant did not like some of the Minor Victim's friends, including a boy she had dated. *Id.* at 3:42:53PM-3:51:37PM. Defendant's specific statements, included "I love her like a daughter," in reference to the Minor Victim, and "I don't even know how old she is to be honest with you." *Id.* The officers' questioning in this portion of the interrogation on, *inter alia*, Defendant's family life, past living arrangements, and relationship with the Minor Victim "bear[s] on the facts of the case" (Defendant is charged with enticement of the Minor Victim) and was "reasonably likely to elicit an incriminating response." *Carneglia*, 603 F. Supp. 2d at 498. This conclusion is bolstered by the officer's statement during this portion of the questioning when he stated "That's what we're here to discuss" in response to Defendant talking about the Minor Victim "not wanting to hear it" when Defendant instructed her not to spend time with certain friends. ECF No. 43, Ex. F at 3:50:40PM

Accordingly, any statements made during this portion of the interview (3:38:50PM-3:51:37PM) must be suppressed.[11] *See Toribio-Toribio*, 2009 WL 2426015, at *2 ("This was not pedigree information obtained during the non-investigative booking process that typically follows a suspect's arrest.") (citation and internal quotation marks omitted).

### ii.    Post-*Miranda* Statements

Defendant argues that he "did not knowingly and voluntarily waive his constitutional rights before being interrogated by police officers."[12] ECF No. 53 at 9. In support of this argument,

---

[11] From 3:51:36PM-3:52:42PM, officers were asking either standard pre-*Miranda* booking questions (for example, "can you read and write?") or engaging in innocuous chatter. The statements made during this portion of the interrogation are not suppressed.

[12] The Court does not read Defendant's motion or objections as making any argument under *Elstad v. Oregon*, 470 U.S. 298, 105 S. Ct. 1285, 84 L.Ed.2d 222 (1985) with respect to whether the post-*Miranda* statements were "made voluntarily and free of coercion." *Elstad*, 470 U.S. at 318. Defendant only argues that he "did not knowingly and voluntarily waive his constitutional rights before being interrogated by police officers." ECF No. 53 at 9. This is a distinct inquiry. *See United States v. Barro*, No. 12–CR–160 (NGG)(LB), 2013 WL 3992405, at *7 (E.D.N.Y. Aug. 2, 2013) ("Whether post-waiver statements are made voluntarily and free of coercion can be a different analysis from whether a suspect made a knowing and voluntary waiver.") (collecting cases). Nonetheless, both inquiries "involve

Defendant asserts that the "prior encounters on March 27, 2020 and the telephone discussions on April 6, 2020, are all relevant to [Defendant's] reasonable understanding while being questioned at Police Headquarters."[13] *Id.* More specifically, he points to the facts that: (1) he expressed his desire not to talk to officers at the March 27, 2020 encounter; and (2) officers' "advise [sic] that he could not have a lawyer until the time of questioning." *Id.* The Government argues that Defendant was advised of, and agreed to waive, his *Miranda* rights during the questioning on April 6, 2020 at Police Headquarters. ECF No. 55 at 9. Judge Pedersen's R&R found that Defendant's waiver during the questioning at Police Headquarters was knowing and voluntary. ECF 52 at 9.

"When the Government asserts that a defendant has voluntarily waived his *Miranda* rights, it must prove the voluntariness of that waiver by a preponderance of the evidence." *United States v. Zamora*, 42 F.Supp.3d 397, 401-02 (N.D.N.Y. 2014) (citation omitted). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived." *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986)).

> This inquiry is directed to a defendant's state of mind, which can be inferred from his actions and statements. Factors to consider when determining whether a defendant knowingly and voluntarily waived his rights include: the characteristics of the accused, such as his experience, background, age and intelligence; the conditions of interrogation; and police conduct, such as physical abuse, handcuff restraint, and psychologically coercive tactics. A defendant's refusal to sign a formal waiver form is not dispositive.

*Id.* (citations, internal quotation marks, and parentheticals omitted).

---

considering the totality of the circumstances surrounding the interrogation" and, as evidenced in the facts below, " the totality of the circumstances surrounding the interrogation indicate that [Defendant's] waiver was knowing and voluntary, and also that his subsequent statements were voluntary and free from coercion." *Id.*

[13] The March 27, 2020 encounter and the April 6, 2020 telephone calls are described above.

Here, Defendant drove himself to Police Headquarters and arrived under his own volition. *See* ECF No. 43, Exs. D & E. Defendant did decline to speak to officers on March 27, 2020 when approached at his home, but that was 10 days prior to the phone calls with officers and subsequent custodial interrogation on April 6, 2020. *See* ECF No. 30-4. Though officers told Defendant over the phone he was under arrest, *id.* at Ex. D, he was not "in custody" at that time, as discussed above.  Furthermore, although, the officer initially stated Defendant did not need his lawyer until arraignment, he corrected himself at the end of the call and told Defendant he could arrive with his lawyer. *Id.* Shortly after Defendant arrived in the interview room on April 6, 2020, the officer informed Defendant he would have to pat him down. Defendant stated in response, "I understand. I've been through this procedure with my ex-wife. I know." ECF No. 43, Ex. F at 3:30:41PM. Thus, it appears that Defendant has had contact with the criminal justice system before. Defendant was not handcuffed during the interview. *See generally id.* Moreover, there are no allegations or indications of physical abuse or psychological coercion and the Court did not note any in its review of the interrogation. *Id.* Defendant, who at the time was 49 years old, indicated during the interrogation that he has a GED; he can read and write; and that he was not under the influence of drugs or alcohol other than nicotine from cigarettes. *Id.* at 3:51:31PM-3:52:08PM.

When Defendant was read his *Miranda* warnings, the officer asked "Do you understand what I said?" Defendant responded with hesitation, "I understand." *Id.* at 3:52:30PM-3:53:14PM. The officer then asked, "Do you wish to talk to me now?" Defendant, again without hesitation, replied "Sure." *Id.* The waiver filled out contemporaneously by Detective Reeder, accurately reflects this exchange and Defendant's waiver of his rights. ECF No. 43, Ex. G. The Court has weighed the totality of these facts and the circumstances surrounding the interrogation and finds that Defendant understood his *Miranda* rights and made a knowing and voluntary decision to

waive those rights and continue to speak with the officers. Accordingly, his motion to suppress the post-*Miranda* statements uttered during the interrogation at Greece Police Headquarters is denied. Statements made from the time Defendant waived his rights (approximately 3:54PM) up to the time Defendant unequivocally invoked the right to counsel (approximately 4:28:28PM) are not subject to suppression.[14]

## III. Invocation of Right to Counsel

In his R&R, Judge Pedersen found that, at the 4:28:28PM mark of the custodial interrogation, Defendant "clearly and unequivocally asked for an attorney and ended the interview." ECF No. 52 at 9. The R&R thus recommended that this court deny Defendant's motion to suppress "up until the time that Defendant invoked his right to counsel." *Id.* The Court reads this ruling as effectively granting Defendant's motion to suppress any statements post-invocation of counsel. Indeed, the Government concedes that "the [D]efendant unequivocally invoked his right to counsel."[15] ECF No. 55 at 10. The Court finds no clear error in this ruling and thus Defendant's post-invocation statements made after the 4:28:28PM mark of the custodial interrogation are suppressed.

---

[14] Defendant does not present any arguments that "deliberate, two-step strategy" was used to obtain the post-warning statements under *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004) and its progeny. *See United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012). Thus, the Court does not consider such an argument *sua sponte*. "Just as a failure to file a timely motion to suppress evidence constitutes a waiver, so too does a failure to raise a particular ground in support of a motion to suppress." *United States v. Lucas*, 383 F. Supp. 3d 105, 112 (W.D.N.Y. 2019) (citing *United States v. Godbey*, No. 11-CR-00292-RJA-JJM, 2012 WL 4061215, at *4 (W.D.N.Y. Aug. 27, 2012), *report and recommendation adopted*, No. 11-CR-292A, 2012 WL 4061085 (W.D.N.Y. Sept. 14, 2012)); *see also United States v. Washington*, 2014 WL 793320, at *3 (W.D.N.Y. Feb. 26, 2014) ("Since this argument was not raised in [Defendant's] pre-hearing motion and is distinct from whether he was Mirandized, I will not consider [Defendant's] post-hearing *Seibert* argument.").

[15] The Government's brief seems to suggest that "the interview stopped" after Defendant invoked his right. ECF No. 55 at 10. However, a review of the video shows that questioning did indeed continue. ECF No. 43 at Ex. F.

### IV.    Defendant's Request for a Suppression Hearing

A court need only hold an evidentiary hearing on a *Miranda* issue "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." *United States v. Perryman*, No. 12-CR-123, 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013); *see also United States v. Cook*, 348 F. Supp. 2d 22, 28 (S.D.N.Y. 2004) ("[A] [d]efendant must do more than make the 'bald assertion' of impropriety . . . in order to sustain a request for a suppression hearing."). Put differently, a party "seeking to raise a factual issue to be determined at a hearing must submit admissible evidence which, if credited, would make out a prima facie case on the issue." *United States v. Ahmad*, 992 F. Supp. 682, 685 (S.D.N.Y. 1998). "This in turn requires that the issue ordinarily be raised by an affidavit of a person with personal knowledge of the facts." *Id*.

Defendant requested a suppression hearing in his motion to suppress but did not object to Judge Pedersen's R&R on the basis that it denied that request. *See generally* ECF No. 30; ECF No. 53. Because Defendant did not object, the Court review's the R&R's finding on this matter for clear error. *See Preston*, 635 F. Supp. 2d at 269. Based upon such a review, and the fact that the pertinent search warrant affidavits and recorded phone calls and interview were made available to this Court, the Court finds no clear error in Judge Pedersen's denial of Defendant's request for a hearing.

### CONCLUSION

For the foregoing reasons, the Court ADOPTS IN PART and REJECTS IN PART Judge Pedersen's R&R, ECF No. 52, and Defendant's motion to suppress, ECF No. 30, is GRANTED IN PART and DENIED IN PART.

The Court adopts Judge Pedersen's findings and denies suppression as to all tangible evidence; adopts Judge Pedersen's findings and denies suppression as to all statements at the March 27, 2020 encounter at Defendant's home; adopts Judge Pedersen's findings and denies suppression as to all statements made on the April 6, 2020 telephone calls; and adopts Judge Pedersen's findings and denies suppression as to all post-*Miranda* statements made up and until the point Defendant invoked his right to counsel (approximately 4:28:28PM).

The Court adopts, under clear error review, Judge Pedersen's finding that Defendant invoked his right to counsel during the interrogation (at approximately 4:28:28PM) and the Court therefore grants suppression of statements made post-invocation.

The Court adopts, under clear error review, Judge Pedersen's findings as to denial of Defendant's motion for a suppression hearing.

The Court rejects Judge Pedersen's findings as to the pre-*Miranda* statements at the April 6, 2020 interrogation at Greece Police Headquarters and grants Defendant's motion to suppress the pre-*Miranda* statements that fell outside of the pedigree exception, as set out more fully above.

IT IS SO ORDERED.

DATED:      March 29, 2021
            Rochester, New York


_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court