UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

             v.

JOSEPH MCGRAIN,

             Defendant.
_____

**DECISION AND ORDER**

6:20-cr-06113 EAW

Defendant Joseph McGrain ("Defendant") pleaded guilty to enticing a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b)—specifically admitting that he tried to persuade the minor victim to send him photographs constituting child pornography. (Dkt. 80 at 9-12). Defendant also pleaded guilty to related obstruction of justice counts. (*Id*. at 12-13). However, Defendant denies engaging in sexual intercourse with the minor victim or actually causing the minor victim to create and send photographs that constituted child pornography. The resolution of those factual disputes impacts the Sentencing Guidelines in this case, and therefore the Court conducted an evidentiary hearing. (Dkt. 109; Dkt. 111).

For the reasons set forth below, the Court concludes that Defendant repeatedly engaged in sexual intercourse with the minor victim and he persuaded, induced, enticed, and coerced her to create and send to him images constituting child pornography. The Court also concludes that Defendant had custody, care, and/or supervisory control over the minor victim. As a result, the Court overrules Defendant's objections to the presentence investigation report.

- 1 -

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant was charged by criminal complaint filed on April 10, 2020, with violating 18 U.S.C. § 2422(b) by knowingly, using a facility or means of interstate or foreign commerce, attempting to persuade, induce, entice or coerce an individual who had not attained the age of 18 years, to engage in sexual activity for which any person can be charged with a criminal offense. (Dkt. 1). On August 20, 2020, an indictment was returned by a federal grand jury charging Defendant with enticement of a minor in violation of 18 U.S.C. § 2422(b) (count one), attempted obstruction of justice in violation of 18 U.S.C. § 1512(b)(1) (count two), and obstruction of justice in violation of 18 U.S.C. § 1519 (count three). (Dkt. 17).

On April 28, 2021, Defendant appeared before the undersigned and pleaded guilty to all counts in the indictment without the benefit of a plea agreement. (Dkt. 76; Dkt. 80). Defendant initially appeared before the undersigned on April 20, 2022, but that plea did not go forward because while Defendant admitted to having an inappropriate relationship with the minor victim (his girlfriend's daughter) (hereinafter "MV1")[1], he denied having sex with her or trying to induce her to have sex while she was a minor (claiming that they were "waiting until she was 18"). (Dkt. 74 at 27). On April 28, 2021, Defendant again appeared before the undersigned and while still denying that he engaged in sex with MV1 or that he was trying to do so while she was a minor, he admitted to trying to persuade

---

[1]   Although MV1 is now 18 years old (*see* Dkt. 112 at 7-8), for purposes of her privacy she will be referred to throughout this Decision and Order as MV1.

MV1 to send him pictures using her cell phone of herself engaged in sex acts. (Dkt. 80 at 5-6).

A presentence investigation report was prepared (Dkt. 79), with revisions to the same filed on three subsequent occasions (Dkt. 82; Dkt. 86; Dkt. 93), the most recently revised version of which is dated August 30, 2021 (*see* Dkt. 93 (hereinafter "the PSR")). The PSR reflects a total offense level of 43 based, in part, on factual findings that (1) Defendant engaged in a sexual relationship with MV1, (2) MV1 was in the custody, care, or supervisory control of Defendant, and (3) Defendant knowingly persuaded, induced, enticed, and coerced MV1 to use her cell phone to send images of herself engaged in sex acts, which would constitute the production of child pornography. (Dkt. 93 at ¶¶ 42-45, 50-53). Defendant objects to these factual conclusions and the resulting offense level calculation. (Dkt. 85 at 2-7).

To resolve the objections, an evidentiary hearing was conducted before the undersigned on December 8, 2021, and continued on December 14, 2021. (Dkt. 109; Dkt. 111). The government presented the testimony of MV1 along with various exhibits, including a videotaped interview of MV1 conducted on April 6, 2020 (Govt. Ex. 1), Facebook chats between MV1 and Defendant (Govt. Exs. 2 and 8), text messages between MV1 and Defendant (Govt. Ex. 3), an audio recording of MV1 (Govt. Ex. 4), and a jail call recording between Defendant and his daughter (Govt. Ex. 5). Defendant presented the testimony of Isabella McGrain (his oldest daughter), Kama McGrain (another daughter), and Angel Wolf (a cousin). At the conclusion of the hearing, the Court provided the parties with an opportunity to file written submissions, but neither party elected to do so.

## LEGAL STANDARD

"At sentencing, disputed factual allegations must be proven by the government by a preponderance of the evidence. . . ." *United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir. 2003); *see also United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("We have held that facts relevant to sentencing must be found by a preponderance of the evidence."). "The sentencing court's discretion is 'largely unlimited either as to the kind of information [s]he may consider, or the source from which it may come.' Any information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). In other words, sentencing proceedings are not "second trials." *United States v. Fatico*, 603 F.2d 1053, 1057 (2d Cir. 1979).

The Second Circuit has held that the confrontation clause as articulated in *Crawford v. Washington*, 541 U.S. 36 (2004), does not apply at sentencing, *see United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005), and the sentencing court may consider hearsay statements in determining an appropriate sentence, so long as in the case of a dispute the government introduces corroborating evidence, *see United States v. Weinberg*, 852 F.2d 681, 685 (2d Cir. 1988) ("It has long been established that hearsay evidence is admissible at a sentencing hearing. Even if the defendant challenges the hearsay portions of a presentence report, that evidence need not be disregarded if the government introduces corroborating evidence." (internal citations omitted)); *United States v. Fell*, No. 5:01-cr-12-01, 2018 WL 7247398, at *5 (D. Vt. Mar. 16, 2018) ("As the *Fatico* court stated:

'[W]hen the defendant does not dispute the truth of the statements sought to be introduced or the statements are sufficiently corroborated by other evidence, hearsay is admissible in sentencing proceedings.'" (citation omitted)); *see also United States v. Scott*, 614 F. App'x 567, 569 (2d Cir. 2015) (explaining that a district court may rely on hearsay evidence during sentencing, but that such hearsay evidence must be "sufficiently reliable").

## EVIDENTIARY HEARING TESTIMONY

### I. Testimony of MV1

MV1 testified that her mother started dating Defendant in the spring of 2018 (Dkt. 112 at 11), and that she and her mother moved into his house at 15 South Ridge Drive in Spencerport, New York, toward the end of the ninth grade, when she was 14 years old (*id*. at 12-13).[2] In addition to Defendant, two of his daughters—including Kama who testified at the hearing—were living at the house. (*Id*. at 12-14). The move caused MV1 to change school districts from the ninth grade to tenth grade, which was difficult for her, and she ended up confiding in Defendant whom MV1 considered "the father I never had." (*Id*. at 15).

In the fall of 2018, when MV1 was 14 years old, her mother was unhappy when she discovered that MV1 had been smoking marijuana to help her sleep. (*Id*. at 16). MV1 testified that she obtained the marijuana from Defendant. (*Id*.). MV1's mother suggested that instead of using marijuana, she should have Defendant lie next to MV1 in bed as she fell asleep, like he did with his youngest daughter. (*Id*.). MV1 had never had any type of

---

[2] In the spring of 2018, Defendant would have been 47 years old. (*See* Dkt. 93 at 2 (listing Defendant's birthdate)).

- 5 -

sexual relations at that point—in fact, she had never even kissed anyone. (*Id*. at 17). That night, as Defendant stayed in MV1's bed to help her fall asleep, he reached down MV1's pants and started touching her vagina and penetrated her with his finger. (*Id*.). This conduct continued over the ensuing weeks, eventually leading to Defendant and MV1 having sexual intercourse. (*Id*. at 21). MV1 was 14 years old when the sexual intercourse first occurred. (*Id*.). MV1 testified that her best estimate was that she had sexual intercourse with Defendant 400 times over the span of a year and a half, and that "pretty much every day" she was at her mother's house she had sexual intercourse with Defendant so long as they could "get away from the other people in the household long enough." (*Id*. at 21-22).

In March of 2019, MV1 was admitted to the psychiatric unit at Strong Memorial Hospital because she started cutting herself as a way to cope with what was happening with Defendant. (*Id*. at 25-26). In the summer of 2019, MV1 moved with her mother and Defendant to Wood Road in Greece, New York. (*Id*. at 23-24). Also living in the house on Wood Road were Defendant's two daughters who had lived with them at the South Ridge Drive address (including Kama), along with another daughter (Isabella or "Bella"), Bella's boyfriend (Aaron), MV1's brother Thomas (who was dating Kama (*see id*. at 103)), and Defendant's cousin's daughter (Angel Wolf) (*id*. at 24). The sexual relationship between MV1 and Defendant continued. (*Id*. at 25). MV1 had not told anyone about what was occurring. (*Id*.). When MV1 would tell Defendant she wanted to stop, he would threaten to kill himself. (*Id*. at 32). MV1 was aware that Defendant had a prior history of a suicide attempt through a drug overdose. (*Id*.).

As this was occurring, Defendant supplied MV1 with many different types of drugs. Specifically, MV1 testified as follows:

> Q   Did there ever come a point while you lived at Wood Road where the Defendant supplied you with additional drugs?
>
> A   Yes. So at that point he had supplied me with still marihuana, but also he supplied me with cocaine a few times. He supplied me with Molly quite a few times. There was, like, a good couple months where I was getting that every day, every couple of days.
>   And then he would sometimes have weed that, maybe, was laced with LSD or THC vape, that was laced with LSD. And I wouldn't always know until afterwards that that was laced. As well as one time I had synthetic marihuana that had Fentanyl in it.
>
> Q   And who gave you all of those drugs that you just described?
>
> A   Joseph McGrain.

(*Id*. at 26-27).

MV1 testified concerning various electronic messages that she exchanged with Defendant, as reflected in part by Government Exhibits 2 and 8. (*Id*. at 30-33, 39-42). From 2019 until the activity was discovered on March 27, 2020, MV1 would sometimes stay at her father's house in Henrietta, New York, because she was trying to get away from Defendant. (*Id*. at 33-34, 37-38; 99-100; *see id*. at 84 (MV1 testifying that initially she did not stay with her father at all, but after she moved to Wood Road she went over to her father's and in total was probably there about 25 percent of the time)). Defendant would become aggravated with MV1, telling her that her absence was harming his youngest daughter with whom MV1 had a close relationship and he threatened to take away family vacations. (*Id*. at 35-36). As a result, MV1 returned to the Wood Road residence and continued the sexual activity with Defendant. (*Id*. at 38-39). MV1 testified that she was

depressed and suicidal, and she did not know how to end the sexual relationship "without everybody getting hurt." (*Id*. at 42-43).

In response to a sexually explicit message from Defendant to MV1 (*see* Govt. Ex. 2 at 332), MV1 sent him a sexually explicit photograph on Snapchat (Dkt. 112 at 43-44). MV1 sent Defendant multiple sexually explicit photographs using Snapchat. (*Id*. at 44). MV1 did not do this on her own, but rather would send the photographs in response to a request from Defendant or because he was being mean to her and she knew it would cause him to be nicer to her. (*Id*.; *see also id*. at 127-130). All of the photographs were specifically created immediately before being sent to Defendant. (*Id*. at 45). Some of the photographs that MV1 sent to Defendant included pictures of her exposed vagina and of herself masturbating. (*Id*. at 45, 128-129). Snapchat was used to create the photos, and then the photo was immediately deleted once the recipient read the message. (*Id*. at 43-45). By February of 2020, MV1 was having sexual intercourse with Defendant on a daily basis. (*Id*. at 46).

On March 27, 2020, shortly after the beginning of the COVID-19 pandemic, MV1 was confronted by several people in the house who had viewed the messages with Defendant on her cell phone. She had a conversation with her brother Thomas, Defendant's daughters Kama and Bella, Angel, and Aaron. (*Id*. at 119). MV1 described it as a "mountain of evidence on that phone, and I wasn't going to try and talk my way out of it." (*Id*. at 51). Without MV1's knowledge, part of that conversation was recorded. (*See* Govt. Ex. 4 and 4A). MV1 deleted evidence of the communications with Defendant from her phone at Bella's request when law enforcement arrived. (Dkt. 112 at 59). MV1

forgot to delete the messages from Facebook Messenger, which are contained at Government Exhibits 2 and 8, but she deleted everything from Snapchat, Instagram, and all the text messages. (*Id*. at 59). After law enforcement came to her house on March 27, 2020, MV1 and Defendant surreptitiously communicated using "Text Now." (*Id*. at 61; *see* Govt. Ex. 3). During those communications, Defendant asked MV1 to lie and say that she set the whole thing up. (*Id*. at 64-65).

## II. Testimony of Defendant's Daughters and Cousin[3]

The testimony of all three of Defendant's witnesses established that the houses that they lived in with Defendant and MV1 were very small and crowded, and the "walls were very thin" so that when others in the household were engaged in sexual relations, the activity could be heard by others in the household even if the conduct occurred behind closed doors. Yet, nobody ever observed or heard Defendant and MV1 engaged in sexual relations.[4] Isabella McGrain testified to discovering the communications between Defendant and MV1 on MV1's cell phone and being surprised by the content of the communications. However, on cross examination she admitted to looking through the phone, in part, due to suspicions concerning the relationship between MV1 and Defendant.

---

[3] A transcript was not prepared of this testimony, and therefore the recitation of it is based on the undersigned's notes.

[4] There was testimony that certain observed behavior between MV1 and Defendant was unusual, such as when MV1 was seen lying on top of Defendant on a love seat in the living room, but there was no evidence suggesting that anyone else in the household knew that MV1 and Defendant were having sex before the communications on MV1's cell phone were discovered on March 27, 2020.

Isabella McGrain also admitted to discussing with MV1 deleting the communications on the cell phone.

## FINDINGS OF FACT

The Court finds that MV1 was entirely credible and believable, and that the evidence demonstrates by a preponderance of the evidence that she and Defendant engaged in sexual intercourse repeatedly and consistently from the time she was 14 years old until on or about March 27, 2020. Indeed, the Court would not hesitate to conclude that the evidence established this fact beyond a reasonable doubt—which, of course, is not the standard at sentencing. There are several reasons for the Court's conclusions in this regard.

First, based on her demeanor and the consistency of her testimony, MV1 was entirely believable on the witness stand. It was apparent to the Court that MV1 did not relish the fact that she was testifying against Defendant nor did she want their conduct to be exposed because of the devastating impact it would have on their family. But nonetheless, she bravely retold her story of what occurred with Defendant.

Second, MV1's testimony is consistent with the documentary evidence in this case. Of course, many of the communications between MV1 and Defendant were deleted, but MV1 neglected to delete their communications using Facebook messenger. These communications corroborate MV1's testimony. For instance, in one exchange occurring on February 23, 2020, Defendant states to MV1:

> I want to feel you…I want to feel your naked body and fuck you so hard.then throw you down and lick you….

(Govt. Ex. 2 at 332).  In another exchange that same day, he states "the sex is noth [sic] worth it…"  (*Id*. at 328; see also Govt. Ex. 8 at 269 (Defendant communicating to MV1: "Hope we can have another night like last.i enjoy it."); 274 ("I miss our nights")).

Third, MV1's story has been largely consistent throughout.  In other words, when one reviews the audio recording of MV1 when she was confronted by Defendant's daughters and others on March 27, 2020 (*see* Govt. Ex. 4 and 4a), and the videotaped interview that occurred on April 6, 2020 (*see* Govt. Ex. 1), her statements concerning the conduct with Defendant are consistent with her testimony at the evidentiary hearing.[5]

Fourth, there is no evidence that contradicts MV1's version of events, nor any credible suggestion that she has any motive to fabricate her testimony.  At best, Defendant presented testimony that others in the household did not hear the alleged sexual activity between MV1 and Defendant, but that simply established that Defendant and MV1 were successful at hiding their activity.  By contrast, Defendant's version of events is not credible.  It was established through the testimony of his daughters that initially Defendant lied and told them that MV1 had fabricated the electronic communications between them.  This was corroborated by the jail call between Defendant and his daughter.  (*See* Govt. Ex. 5).  Ultimately Defendant conceded as part of his plea that, in fact, he did engage in "inappropriate" communications with MV1, but he insisted that they were planning to wait until MV1 turned 18 years old to engage in sexual intercourse.  This is not credible.  Indeed,

---

[5]   When initially confronted about the activity, MV1 stated that the intercourse with Defendant began when she was 15 years old as opposed to 14 years old, but she explained at the hearing how she knew that it actually began when she was 14 years old, and the Court finds MV1's testimony credible.  (*See* Dkt. 112 at 53).

the Court concludes that Defendant perjured himself in the plea proceedings when he denied engaging in sexual intercourse with MV1.

Fifth, Defendant's obstructive acts that he has admitted engaging in as part of his plea, including his destruction of his own cell phone data (*see* Dkt. 80 at 13), constitutes evidence of his consciousness of guilt. For instance, shortly after the activity was discovered, Defendant communicated to MV1 to "tell them you set it all up and lied." (Govt. Ex. 3). These attempts to influence MV1's testimony and destroy evidence constitute strong circumstantial evidence of the sexual activity between Defendant and MV1.

Thus, for all of these reasons, the Court easily concludes that Defendant repeatedly and consistently engaged in sexual activity, including sexual intercourse, with MV1 from the time she was 14 years old until on or about March 27, 2020.

In addition, the Court also concludes that the credible evidence in the record establishes that Defendant persuaded, induced, enticed, and coerced MV1 to create images of herself engaged in sexual activity that she sent to Defendant using Snapchat. MV1 credibly testified that she created the images that she sent to Defendant immediately before they were sent, she created these images at Defendant's request (or to make him treat her better when he was being unkind), the images reflected sexually explicit conduct, and she identified one of the written exchanges with Defendant where an image was sent. (*See* Govt. Ex. 2 at 332). Indeed, the credible evidence establishes that Defendant regularly manipulated MV1 into engaging in the conduct that he desired—whether it be continuing their sexual activity or producing child pornography. Defendant engaged in this

manipulation through threats to harm himself, threats to revoke vacations and other benefits that he could provide to MV1, and through emotional control of MV1.

Finally, the Court concludes that Defendant was in a parent-like relationship with MV1, exercising control over the households that she lived in and her everyday activities, and he was responsible for her wellbeing. More than thirty years older than MV1, Defendant exploited that relationship for his own personal gratification with no care or concern over the devastating impact it had on MV1.

## CONCLUSIONS OF LAW

**I.     Defendant Repeatedly Engaged in Sexual Intercourse with MV1**

As noted above, the Court concludes that the evidence supports a finding by a preponderance of the evidence that Defendant repeatedly engaged in sexual intercourse with MV1 from the fall of 2018, when she was just 14 years old, until on or about March 27, 2020, when the activity was discovered. This factual conclusion resolves many of Defendant's objections to the PSR. Specifically, Defendant objected to application of U.S.S.G. § 2G1.3(b)(2)(B) (increasing offense level by two if "a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct") and U.S.S.G. § 2G1.3(b)(4)(A) (increasing offense level by two if "the offense involved the commission of a sex act or sexual contact")[6] on the ground that he did not engage in sexual activity with

---

[6]    These specific offense characteristics are addressed in the PSR's discussion of the calculations under U.S.S.G. § 2G1.3. (Dkt. 93 at ¶¶ 43 & 45). However, similar specific offense characteristics are not included in U.S.S.G. § 2G2.1, and therefore because of the Court's finding with respect to the applicability of the cross reference under U.S.S.G. § 2G1.3(c)(1), these adjustments are not factored into the Court's ultimate determination as to the correct offense level.

MV1. (Dkt. 85 at 6). Defendant also objected on the same basis to the five-level increase in the offense level pursuant to U.S.S.G. § 4B1.5(b) based on a finding that Defendant engaged in a pattern of activity. (*Id.* at 6-7; *see* Dkt. 93 at ¶ 71). Because Defendant engaged in sexual contact with MV1 repeatedly and consistently for more than a year, these objections are overruled.

## II.     Defendant Caused MV1 to Produce Child Pornography

The PSR concludes that the cross reference to production at U.S.S.G. § 2G2.1 applies in this case (Dkt. 93 at ¶ 50), and Defendant objects to that conclusion arguing that "there is insufficient evidence to conclude that Mr. McGrain enticed the Victim to produce child pornography, as opposed to commit another crime." (Dkt. 85 at 3). While acknowledging that he admitted as part of his plea to attempting to persuade MV1 to send pictures of herself engaged in sex acts using her cell phone (Dkt. 85 at 3-4; *see* Dkt. 80 at 5), Defendant argues that he never admitted to requesting that MV1 "actually take or produce images of child pornography, only to send them" (Dkt. 85 at 5).

> U.S.S.G. § 2G1.3(c)(1) provides as follows:
>
> If the offense involved causing, transporting, permitting, or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, apply § 2G2.1 (Sexually Exploiting a Minor by Production of Sexually Explicit Visual or Printed Material; Custodian Permitting Minor to Engage in Sexually Explicit Conduct; Advertisement for Minors to Engage in Production), if the resulting offense level is greater than that determined above.

Application Note 5 to U.S.S.G. § 2G1.3 provides that the cross reference in subsection (c)(1) "is to be construed broadly" and includes all instances where the offense involved,

among other things, persuading, inducing, enticing or coercing a minor to engage in "sexually explicit conduct" for the purpose of producing any visual depiction of that conduct. Sexually explicit conduct is defined consistent with 18 U.S.C. § 2256(2) and includes masturbation or lascivious exhibition of the genitals or pubic area.

Here, not only did Defendant admit to trying to persuade MV1 to send him images of herself engaged in sexually explicit conduct, but the Court finds that the credible hearing testimony of MV1 established that she sent sexually explicit images to Defendant and it was Defendant who caused MV1 to produce the images. MV1 expressly identified one of the sexually explicit messages from Defendant that caused her to send him an image of herself engaged in sexually explicit conduct (*see* Govt. Ex. 2 at 332), and MV1's testimony established that she did this using Snapchat on multiple occasions at Defendant's behest (either through Defendant's express requests or manipulative conduct). Accordingly, the Court concludes that pursuant to U.S.S.G. § 2G1.3(c)(1), the cross reference to production at U.S.S.G. § 2G2.1 applies.

### III.    MV1 was in the "custody, care, or supervisory control" of Defendant

The PSR concludes that a two-level increase in the offense level applies because MV1 was in the "custody, care, or supervisory control" of Defendant. (Dkt. 93 at ¶ 42 (applying U.S.S.G. § 2G1.3(b)(1)(B)); ¶ 52 (applying U.S.S.G. § 2G2.1(b)(5)). Defendant objects arguing that he did not have this type of control over MV1 because she did not live full-time with her mother and Defendant, but rather lived with her father. (Dkt. 85 at 5). Moreover, according to Defendant, when MV1 did live with her mother, "the mother made

clear that she would raise her own children and that Mr. McGrain was expected to raise his." (*Id*. at 5).

Application Note 5 to U.S.S.G. § 2G2.1 provides that subsection (b)(5) "is intended to have broad application" and the Court "should look to the actual relationship that existed" between MV1 and Defendant and "not simply to the legal status of the defendant-minor relationship" in determining whether the adjustment applies. *See also* U.S.S.G. § 2G1.3, Application Note 2 (same). Although it does not appear that the Second Circuit has expressly addressed the scope of relationships that qualify for this adjustment, decisions from other circuits are instructive. Some courts have explained the requirement as involving a relationship that involved "[p]arent-like authority" which can be evaluated "by asking whether it would have been the defendant who 'would have taken [the minor] to the emergency room, would have signed the applicable forms, and would have requested for [the minor] to receive treatment.'" *United States v. Harris*, 999 F.3d 1233, 1237 (9th Cir. 2021) (alterations in original and quoting *United States v. Alfaro*, 555 F.3d 496, 498 (5th Cir. 2009)). Another court has described the relationship as involving the defendant being "responsible for looking after the child's wellbeing." *United States v. Isaac*, 987 F.3d 980, 992 (11th Cir. 2021). In that regard, the non-exhaustive examples of qualifying relationships set forth in the Application Note (teacher, day care provider, baby-sitter, or other temporary caretaker) can provide a useful tool for comparison of a defendant's role with respect to the minor. *See id.* (collecting cases where actual defendant-minor relationship is analogized to examples provided in Application Note).

"'[P]roximity' is not enough to establish that the defendant had been entrusted with the child." *United States v. Kenyon*, 481 F.3d 1054, 1072 (8th Cir. 2007) (citing *United States v. Blue*, 255 F.3d 609, 614-15 (8th Cir. 2001) (holding that a defendant who assaulted a child in the bathroom while his mother was present in the home had not been entrusted with the child, even though the child and his mother had been living with the defendant for six months)). However, a defendant is not required to have exclusive custody of the minor—"[s]o long as the defendant has some responsibility for the child, he has been entrusted with the child, even if another shares that responsibility." *Kenyon*, 481 F.3d at 1072.

The Court finds that MV1 was in the care, custody, and/or supervisory control of Defendant so that the adjustment applies. First, the origin of the conduct between Defendant and MV1 demonstrates the applicability of this adjustment. MV1's mother suggested that Defendant help MV1 fall asleep by lying next to her in bed, as he did with his own daughter, thus demonstrating that the actual relationship between Defendant and MV1 involved Defendant being responsible for her wellbeing and having parent-like authority.

Second, MV1 plainly perceived Defendant as having that role in her life—describing him as "the father I never had." (Dkt. 112 at 15). Similarly, the testimony of Defendant's daughter Kama supports the nature of this relationship, when at one point she described contact that occurred between Defendant and MV1 while on a boat in the Thousand Islands as being attributed to normal father/daughter conduct. The fact that MV1 spent some time at her father's house during the relevant time period—approximately 25

percent of the time once they moved to the Wood Road house in an effort to get away from Defendant (Dkt. 112 at 84)—does not change the nature of the relationship.

Third, while MV1's mother may have ultimately had more responsibility than Defendant for the supervision of MV1, this does not mean that Defendant did not have the requisite relationship. MV1 testified that Defendant set the rules of the house, and Defendant was plainly involved in parenting decisions with respect to MV1, such as the disagreements that occurred in the house over MV1's relationship with "Chad," which Bella testified about (explaining that both Defendant and MV1's mother did not approve of the relationship and that this caused disagreements in the house). (*See also* Dkt. 112 at 86-87 (MV1 testifying about disagreements between her mother and Defendant over parenting decisions with respect to MV1 and Defendant's youngest daughter)).

In all, considering that MV1 and Defendant lived in two separate houses together for approximately a year and a half while Defendant was involved in a relationship with MV1's mother; MV1's perception of Defendant as a father-figure which was supported by other evidence; Defendant's role in MV1's supervision and setting of the house rules; the origin of the conduct between Defendant and MV1; and the nature of the relationship between MV1 and Defendant where Defendant plainly exercised control over MV1's everyday activities, the Court concludes that Defendant had a parent-like relationship with MV1, he was responsible for her wellbeing, and he had custody, care and/or supervisory control over MV1.

**CONCLUSION**

For the foregoing reasons, Defendant's objections to the PSR are overruled. Finally, the Court notes that the PSR reduces the offense level by two pursuant to U.S.S.G. § 3E1.1(a)[7] (Dkt. 93 at ¶ 72), but the PSR also indicates that the Court will ultimately have to make that determination at sentencing (*id.* at ¶ 38). The parties should be prepared to address this issue, among others, at sentencing.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:   February 1, 2022
         Rochester, New York

---

[7] The government has not filed a motion for an additional reduction of one level pursuant to U.S.S.G. § 3E1.1(b), and Defendant has not voiced any objection to that decision. (*See* Dkt. 85 at 2-7).